UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| ASHLEY QUIÑONES, as trustee for Brian Jesús Quiñones-Rosario, | Case No. 20-CV-1329 (PJS/BRT) |
| Plaintiff, | |
| v. | ORDER |
| CITY OF EDINA, Minnesota; CITY OF RICHFIELD, Minnesota; NICHOLAS PEDERSEN; BENJAMIN WENANDE; JOSEPH CARROLL; MACABE STARIHA; and DYLAN SCHULTZ, all individuals being sued in their individual and official capacities, | |
| Defendants. | |

Francis H. White, III, and Brian K. Lewis, FRANCIS WHITE LAW, PLLC; Ruth N. Lane, LANE LAW AND CPA SERVICES, LLC, for plaintiff.

Patrick S. Collins and Joseph E. Flynn, JARDINE, LOGAN & O'BRIEN, P.L.L.P., for defendants City of Edina, Nicholas Pedersen, and Benjamin Wenande.

Julia C. Kelly, Jason M. Hiveley, Stephanie A. Angolkar, and Aaron M. Bostrom, IVERSON REUVERS, for defendants City of Richfield, Joseph Carroll, Macabe Stariha, and Dylan Schultz.

On September 7, 2019, Brian Jesús Quiñones-Rosario committed suicide by cop.

That night, after giving his family cryptic good-byes, he drove off alone. While

streaming on Facebook Live, he drove erratically until he caught the attention of Edina

and Richfield police officers.  After a five-minute pursuit, Brian[1] abruptly braked.  He grabbed a large knife, got out of his car, and defied numerous commands from the officers to drop the knife.  Instead, Brian shouted "do it!" at the officers, who were aiming their guns at Brian.  After Brian charged at the officers with the knife, two of them fired a short volley of shots.  After Brian continued to advance, four officers fired a second volley.  Brian finally fell to the ground and died soon after.

Plaintiff Ashley Quiñones, Brian's widow, brought this action against the five officers involved in her husband's death and against the cities for which those officers work.  Ashley asserts claims under both federal and state law.  The matter is now before the Court on the defendants' motions for summary judgment.  Because the officers clearly did not violate Brian's constitutional rights, the Court dismisses the federal claims.  The Court declines to exercise supplemental jurisdiction over the state-law claims.

## I.  BACKGROUND

### A.  Good-Byes and Pursuit

On the evening of September 7, 2019, Brian had a conversation with his sister, Wilma Quiñones-Rosario, via Facebook messages; he discussed with her the outcome of

---

[1]The Court will use first names for several people who are involved in this case and who have the last name "Quiñones."

a talk with his son, C.Q., after C.Q. was caught smoking marijuana.  ECF No. 37-1 at 12.[2]

In the midst of the conversation with Wilma, Brian abruptly said, "Yea.  I ain't shit."

Wilma asked, "Why you say that," to which Brian responded only, "I'm so sorry."  *Id.* at

12–13.  Wilma sent three follow-up messages, but Brian did not respond.  *Id.* at 13, 46.

Around that same time, Brian approached C.Q. and told him to "never look up to

[Brian]."  ECF No. 38 at 6.  Brian then hugged C.Q.'s great-grandfather (and Ashley's

grandfather) Donald Williams, *see* ECF No. 37-3 at 4–5—the three were all at Williams's

house, *see* ECF No. 38 at 6—and thanked him "for making [Brian] a better man or

knowing what it is to be a man," ECF No. 37-3 at 10.

As Brian began to leave, C.Q. told Williams "something is wrong with my dad,"

and Williams agreed that Brian's behavior was "unusual" because "Brian is not the

emotional type."  ECF No. 37-3 at 10.  The two went outside to stop Brian from leaving;

they found Brian as he was getting into his car.[3]  *Id.*  Brian did not stop; after

responding, "I'll see you tomorrow," he drove off.  *Id.*

Williams and C.Q. were worried about Brian's emotional well-being.  They got in

a car and tried to follow him; Williams drove, while C.Q. tried to call his mother,

---

[2]When citing documents by ECF number, the Court cites the page numbers
generated by the Court's electronic docketing system rather than the document's
internal pagination.

[3]The car was registered in Ashley's name, but Brian regularly drove it.  ECF
No. 37-3 at 10.

Ashley.  *Id.*  The two went to Brian and Ashley's house, but Brian's car was not there.

*Id.*  C.Q. kept trying to call his mother while Williams kept driving.  *Id.*  Williams

eventually saw a police car with its lights on and began following it.  *Id.*  Suddenly,

Brian drove past Williams on the other side of the road, and C.Q. immediately

recognized his father's car.  *Id.*  Another squad car was pursuing Brian.  *Id.* at 10–11.

Brian had attracted the attention of police officers shortly after 10:00 pm.  ECF

No. 37-6 at 5.  As is evident from his contemporaneous stream on Facebook Live, Brian

had been driving recklessly in the rainy weather: speeding, running stoplights, weaving

between lanes, and holding his phone while driving.  *See, e.g.*, ECF No. 36-9 at 0:20–0:40,

2:15–2:40, 5:45–6:10.  At one point, Edina Police Officer Nicholas Pedersen saw Brian

turn right at a red light without stopping or signaling his turn.  ECF No. 37-5 at 11, 14;

*see also* ECF No. 36-22 at 0:27–0:30.  After following Brian for about a quarter of a mile at

about 10 to 15 miles per hour above the speed limit, Pedersen turned on his squad car's

emergency lights (just after Brian made another turn without signaling), and Pedersen

turned on his siren after Brian continued another block without stopping.  ECF No. 37-5

at 14–15; *see also* ECF No. 36-1 at 1:20–1:40.  With Brian refusing to stop, Pedersen began

to pursue him for committing the felony of fleeing a police officer in a motor vehicle.

ECF No. 37-5 at 15, 18.

After calling for assistance, Pedersen was joined by Edina Police Officer Benjamin Wenande, who activated his own emergency lights and drove toward Pedersen's location.  ECF No. 36-10 at 867.  Richfield Police Officers Macabe Stariha, Joseph Carroll, and Dylan Schultz also joined the pursuit as it reached the City of Richfield's borders.  *Id.* at 586, 604–05, 620.

Meanwhile, Ashley had received calls from both C.Q. and Wilma.  C.Q. had told Ashley "something was wrong with Brian and Brian was upset," ECF No. 37-4 at 24–25, and Wilma told her that "Brian was live on Facebook . . . and he might be pulled over by the police," *id.* at 25.  At Wilma's behest, Ashley activated an app to try to track Brian's location.  *Id.* at 25–26.  Brian had a habit of driving certain routes while "in a zone for rapping," and Ashley started driving those "loops" to look for him.  *Id.* at 26.

Eventually, Ashley found Brian and the squad cars pursuing him, all with lights and sirens activated.  *Id.*  Ashley passed Pedersen's squad car mid-pursuit and pulled up next to Brian's car for a period of time before braking to avoid hitting vehicles stopped at a red light.  ECF No. 36-1 at 6:02–6:12; ECF No. 37-4 at 26.  Brian ran that light, barely missing a car turning out of the cross-traffic.  ECF No. 36-1 at 6:09–6:13.  Ashley tried to follow Brian and Pedersen.  She abruptly passed a vehicle turning right at the intersection and then changed lanes, twice cutting off Schultz during his pursuit of Brian.  ECF No. 36-2 at 3:08–3:15; ECF No. 37-4 at 26.

Pedersen—after seeing Brian recklessly drive through yet another red light and almost hit another car—attempted a PIT maneuver[4] to stop Brian.  ECF No. 37-5 at 22.  Pedersen missed, but Brian suddenly braked.  *Id.* at 22–23.  Pedersen also braked, stopping close to the front right of Brian's car.  *Id.* at 23.  *See also* ECF No. 36-1 at 6:27–6:37 (video footage of the attempted PIT maneuver and the sudden braking afterward).

## B. The Shooting

After stopping, Brian grabbed a large knife and got out of his car.  ECF No. 37-6 at 7 fig.3 (depicting still frames from ECF No. 36-9 at about 12:07); *see also* ECF No. 37-4 at 27 (confirming that Ashley had kept a kitchen knife in the passenger glove box of Brian's car).  Pedersen got out of his squad car and drew his sidearm.  ECF No. 37-5 at 23.  Brandishing the knife, Brian advanced toward Pedersen, and Pedersen ordered Brian to "[g]et on the ground!"  *Id.* at 24; ECF No. 36-1 at 6:39–6:41.  Brian did not comply; instead, Brian raised his knife above his shoulder while continuing to advance.  As Brian advanced, Pedersen retreated, trying to maintain his distance from Brian.  ECF No. 37-5 at 24–25; ECF No. 36-1 at 6:43–6:46.

---

[4]This is a "method used by police to force a pursued vehicle to abruptly turn sideways to the direction of travel, by bumping the back side of the pursued vehicle with the police vehicle, causing the fleeing driver to lose control and stop."  *United States v. Bazaldua*, 506 F.3d 671, 673 n.2 (8th Cir. 2007).  (The precise words that "PIT" stands for were unsettled as of *Bazaldua*.)

Pedersen mistakenly tried to report "he's got a gun!" but his radio did not transmit that statement.  ECF No. 36-1 at 6:43; ECF No. 36-8 at 4:06–4:13 (recording of police radio transmissions, reflecting only Pedersen's later references to a knife). Pedersen immediately corrected himself, announcing over the radio, "He's got a knife," and then repeatedly ordered Brian to drop the knife.  ECF No. 36-1 at 6:45–6:49.  Again, Brian refused to comply.  Instead, he continued his advance, circling Pedersen and daring him, more than once, to "[d]o it!"  *Id.* at 6:47–6:52; ECF No. 36-2 at 3:37–3:40.

Stariha and Schultz arrived at the scene.  They both had heard Pedersen's repeated commands to drop the knife, either over the radio or at the scene.  ECF No. 36-10 at 587, 622.  Stariha drew his sidearm soon after exiting his squad car.  *Id.* at 587. Then Carroll arrived.  Carroll had also heard Pedersen shout "drop it!" at least once, either over the radio or at the scene.  *Id.* at 607.

Schultz began to approach Brian in order to use a Taser on him, but Brian lunged toward Schultz and Pedersen while still holding the knife.  *Id.* at 621; ECF No. 36-2 at 3:42–3:43.  Schultz then shot his Taser, but Brian continued to advance with the knife; it is not clear whether the Taser bolt missed Brian or whether it hit him but had no impact. ECF No. 36-10 at 621, 625; ECF No. 36-2 at 3:42–3:43.  Pedersen and Stariha fired their weapons.  ECF No. 36-2 at 3:43–3:45; ECF No. 36-3 at 4:05–4:08; ECF No. 36-10 at 587, 896.  Carroll heard the shots and saw Brian continuing to brandish the knife; when

Brian started running in Carroll's direction, Carroll drew his firearm.  *See* ECF No. 36-10 at 605, 608–09.

Next on the scene was Wenande, who had also heard Pedersen's shouts of "he's got a knife!" and "drop the knife!" both on radio traffic before arriving and as he was exiting his squad car.  *Id.* at 868–69; 872.  Wenande then heard the first round of gunshots, even though he could not see what was happening because his view was blocked by the other squad cars.  *Id.* at 869.  Wenande ran to the scene, finding Brian holding himself against a tree with "one hand open and one hand closed."  Brian looked at officers with a "kind of a blank stare" that, according to Wenande's training, indicated that Brian was "in some form of a mental health state or psychosis state."  *Id.*  Wenande elaborated:

> [W]hen he locked eye contact with me . . . [,] I could see that . . . he was physically in pain and that no one was home. That[] . . . something isn't right. . . . I remember thinking that if this guy's already been shot . . . [a]nd he still isn't willing to surrender . . . [,] there's something wrong with him and that he's willing to continue to try and fight with us. . . . I don't know what it is but . . . I know that he's probably not gonna be able to [be] reasoned with or talked down or anything like that.

*Id.* at 874.

Officers continued ordering Brian to drop the knife, but Brian—still holding the knife—instead moved toward Carroll and Wenande;[5] those two officers, along with Stariha and Schultz, fired another round of shots.  ECF No. 36-3 at 4:08–4:11; ECF No. 36-10 at 587, 609, 626, 869.  Brian fell to the ground and finally released the knife, and the officers handcuffed him.  ECF No. 36-2 at 3:48–3:52; ECF No. 36-10 at 869.  The officers administered first aid, but Brian died from his wounds at the scene.  ECF No. 36-10 at 610, 869–71.

The officers fired a total of 18 shots at Brian, seven of which hit him.  ECF No. 36-17 at 16.  Less than five seconds elapsed between the first and second rounds of shots.  *See* ECF No. 36-1 at 6:54–6:59.

## C.  Aftermath

Ashley, having joined the pursuit of Brian, parked her SUV among the parked squad cars.  ECF No. 36-5 at 3:42–3:45; ECF No. 36-6 at 3:38–3:45.  She waited in her SUV, in obvious distress.  ECF No. 36-5 at 3:46–4:00; ECF No. 36-6 at 3:43–4:15.  Richfield Police Officer Hailey Quanbeck began speaking to Ashley, and Ashley spontaneously stated, "That's my husband.  He's suicidal."  ECF No. 36-5 at 4:00–4:05.  Ashley repeated that Brian was suicidal multiple times during her conversation with

---

[5]Wenande did not see a knife in Brian's clenched hand, but he inferred that Brian had a knife because of what he had heard over the radio and from other officers in the moments before the shooting.  ECF No. 36-10 at 869.

-9-

Quanbeck.  *E.g.*, *id.* at 4:56–4:57, 5:58–6:01.  Ashley also repeatedly asked why Brian "would . . . do this to us?"  *Id.* at 7:55–8:17 ("Why would he do this?  Why would he do this to us?  Why would he do this to us?").

In the hours that followed, Brian's family members made statements about Brian's troubled mental state.  Williams told police that Brian had been acting "strange," "out of the ordinary," and "different"; that Brian "had depression"; and that "[Brian had] been having some issues lately."  ECF No. 36-10 at 219–20; *see also id.* at 937–38.  And C.Q. messaged a friend, saying that Brian "wanted it to happen. . . . He was gonna commit suicide but he wanted it to be on the cops. . . . He talked to me and said to never look up to him before it happened he wanted it to happen.  I [k]now this."  ECF No. 38 at 5–6, 18–19.

About five months later, the Hennepin County Attorney's Office found that the five officers who had shot Brian had acted lawfully in using deadly force.  ECF No. 36-17 at 3, 16.  The county attorney therefore declined to bring criminal charges against any of the officers.  *Id.* at 3, 16, 18.

Later, however, Ashley brought this lawsuit against the five officers and the Cities of Edina and Richfield.  ECF No. 1.  She asserts claims of excessive force and failure to intervene under 42 U.S.C. § 1983 against the five officers in their individual and official capacities, *id.* ¶¶ 90–96, 109–13; claims of municipal liability under 42 U.S.C.

§ 1983 and *Monell v. Department of Social Services of City of New York*, 436 U.S. 658 (1978),

against the City of Edina and the City of Richfield, ECF No. 1 ¶¶ 97–108; a slew of state-

law tort claims against the defendants, *id.* ¶¶ 114–51; and a claim for a declaratory

judgment against the defendants that their "policies, pattern of practices, customs, lack

of supervision, failure to train, acts, and omissions . . . violate the Fourth Amendment to

the U.S. Constitution and constitute excessive force in violation of Minnesota state law,"

*id.* ¶¶ 152–54.  The defendants have moved for summary judgment on all claims.  ECF

Nos. 27, 33.

## II.  ANALYSIS

### A.  Legal Standard

Summary judgment is warranted "if the movant shows that there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a matter of

law."  Fed. R. Civ. P. 56(a).  A dispute over a fact is "material" only if its resolution

might affect the outcome of the lawsuit under the governing substantive law.  *Anderson*

*v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A dispute over a fact is "genuine" only if

"the evidence is such that a reasonable jury could return a verdict for the nonmoving

party."  *Id.*  "The evidence of the non-movant is to be believed, and all justifiable

inferences are to be drawn in [her] favor."  *Id.* at 255.

B.  *Individual-Capacity § 1983 Claims*

Qualified immunity protects public officials sued in their individual capacities from being held liable for damages under 42 U.S.C. § 1983 if "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Bradford v. Huckabee*, 394 F.3d 1012, 1015 (8th Cir. 2005) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).  "In resolving questions of qualified immunity at summary judgment, courts engage in a two-pronged inquiry. The first asks whether the facts, '[t]aken in the light most favorable to the party asserting the injury, . . . show the officer's conduct violated a [federal] right.'" *Smith v. Conway Cnty.*, 759 F.3d 853, 858 (8th Cir. 2014) (alterations in original) (quoting *Tolan v. Cotton*, 572 U.S. 650, 655–56 (2014)).  If so, the second prong "asks whether the right in question was 'clearly established' at the time of the violation." *Id.* (quoting *Tolan*, 572 U.S. at 656).

Here, the Court need address only the first question, as the officers plainly did not violate Brian's constitutional rights.  In an excessive-force case, a court employs "the Fourth Amendment's objective reasonableness standard"—in other words, a court asks "whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Hassan v. City of Minneapolis*, 489 F.3d 914, 919 (8th Cir. 2007) (quoting

*Craighead v. Lee*, 399 F.3d 954, 961 (8th Cir. 2005)).  If an "officer has probable cause to believe that [a] suspect poses a threat of serious physical harm, either to the officer or to others, it is not constitutionally unreasonable to prevent escape by using deadly force." *Id.* (quoting  *Brosseau v. Haugen*, 543 U.S. 194, 197–98 (2004)).

In conducting this inquiry, a court must not act as a "Monday morning quarterback."  *Schulz v. Long*, 44 F.3d 643, 649 (8th Cir. 1995).  The court also must not "hinder or interfere with the difficult tasks and emotionally-charged situations that officers face in their daily job."  *Shade v. City of Farmington*, 309 F.3d 1054, 1061 (8th Cir. 2002).  Instead, "the calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving."  *Id.* at 1061–62 (quoting *Gardner v. Buerger*, 82 F.3d 248, 252 (8th Cir. 1996)).

The Court has carefully reviewed the record, especially the video evidence, which was recorded by Brian during his Facebook Live stream and by cameras mounted in the squad cars.  The Court has examined each of the relevant videos many times—at normal speed, in slow motion, and frame-by-frame.  The Court finds that a reasonable juror (even after drawing all reasonable inferences in favor of Ashley) would be compelled to make the following factual findings:

-13-

(1) Brian was behaving erratically before his death, leading his wife, their son, and his wife's grandfather to go looking for him because they were concerned about his mental state.

(2) Brian committed the felony of fleeing a police officer in a motor vehicle.

(3) By leading police officers on a reckless, five-minute chase, Brian endangered not only the lives of those officers, but the lives of numerous innocent motorists and pedestrians.

(4) After abruptly braking and exiting his car, Brian aggressively approached Pedersen, brandished a knife, ignored repeated commands to drop the knife, and repeatedly shouted "do it!"  Pedersen retreated from Brian, trying to keep Brian at a safe distance.

(5) Brian suddenly and quickly charged at the officers with the knife, causing them to respond with the first round of gunfire.

(6) Brian was not felled by the first round of gunfire and did not drop his knife.

(7) Moments after being hit by the first round of gunfire, Brian again moved toward the officers while clutching the knife.  The officers responded with the second round of gunfire.

There is no question that, under the Constitution, an officer may use deadly force against a person who advances toward the officer or another person while brandishing

-14-

a large knife or other weapon capable of inflicting serious injury.  For example, the

Eighth Circuit held that police officers reasonably used deadly force against a man who

was "aggressively brandish[ing] a machete and a tire iron while approaching officers in

a threatening manner and did not slow down, although the officers repeatedly asked

[him] to put down his weapons."  *Hassan*, 489 F.3d at 919.  If an aggressor is not

subdued by a single application of deadly force but continues to pose a threat, a second

application of deadly force is constitutionally reasonable.  *Hayek v. City of St. Paul*,

488 F.3d 1049, 1054–55 (8th Cir. 2007) (second use of deadly force justified after

aggressor had stabbed officer with katana and first use of deadly force "was ineffective

in stopping or controlling" the aggressor, "who continued to pursue" the wounded

officer with the katana).

    The circumstances here clearly justified the use of deadly force.  Similar to the

aggressor in *Hassan*, Brian "aggressively brandished a [knife] while approaching

officers in a threatening manner and did not slow down, although the officers

repeatedly asked [him] to put down his weapon[]."  *Hassan*, 489 F.3d at 919.  And

similar to the situation in *Hayek*, the first round of gunshots "was ineffective in stopping

or controlling [Brian]."  *Hayek*, 488 F.3d at 1054–55.  Officers observed that, even after

being shot with a Taser and then with a round of bullets, Brian continued to advance

toward officers, continued to hold his knife, and displayed a blank stare that was

indicative of a person in an aggressive or psychotic state. In the few seconds after the first round of shots—and under the stress of the rapidly evolving situation—a reasonable officer in the position of the defendant officers could have perceived Brian as preparing to launch a second attack with the knife. *See* ECF No. 36-10 at 874. The officers' second round of fire—the second use of deadly force—was constitutionally reasonable.

In short, there is no genuine dispute that the officers used reasonable force against Brian. And because each officer acted reasonably in using force, no officer had an obligation to intervene to prevent the use of that force.

Ashley makes two main arguments to the contrary. She first claims that Brian did not charge toward officers with the knife. That is simply not true; the video clearly shows that Brian did just that. *See* ECF No. 36-4 at 3:40 (showing Brian darting forward toward officer shortly before first round of gunfire); *see also Scott v. Harris*, 550 U.S. 372, 380 (2007) ("When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment.").[6] And even if Brian did not charge directly at a particular officer just before

_____

[6]The defendants also submitted animated, three-dimensional reconstructions of the shooting, which support the defendants' accounts. ECF Nos. 30-2, 30-3, 37-7. At the hearing, Ashley objected to the Court's consideration of those exhibits as evidence. The
(continued...)

the second round of shots—as he did just before the first round—he undeniably moved in the general direction of the officers while holding the knife.  ECF No. 36-2 at 3:45–3:47 (showing Brian stepping toward officers while crossing his arms, knife still in hand, shortly before second round of gunfire).  Under the circumstances, a reasonable officer could have perceived Brian as an imminent threat.

Ashley also argues that the officers should be held liable under the "provocation rule" that was created by the Ninth Circuit in *Billington v. Smith*, 292 F.3d 1177 (9th Cir. 2002), and then abrogated by the Supreme Court in *County of Los Angeles v. Mendez*, 137 S. Ct. 1539 (2017).  Under the *Billington* rule, a law-enforcement officer can be found liable for using force against a suspect—even if that use of force was reasonable under the circumstances—if, *before* using that force, the officer violated the suspect's Fourth Amendment rights, and the Fourth Amendment violation led to the need to use force. So, for example, if a police officer unlawfully barges into a suspect's home in the middle of the night, the suspect responds by shooting at the police officer, and the police officer returns fire, the police officer could be held liable for shooting the suspect (even if the use of deadly force was justified by the fact that the suspect was shooting at the officer) because the officer's unlawful entry precipitated the exchange of gunfire.

---

[6](...continued)
Court has no reason to doubt the accuracy of the reconstructions, but whether they are admissible is irrelevant.  The Court would reach the same conclusion even if it ignored the reconstructions and relied solely on the videos.

Even if the provocation rule were still good law, the rule would not help Ashley

because there is no evidence that any police officer violated Brian's constitutional rights

before using deadly force against him.  The police lawfully pursued Brian based on

probable cause that he had committed a felony.  Brian never submitted to the police's

show of authority, so he was not "seized" during the police pursuit.  *California v. Hodari*

*D.*, 499 U.S. 621, 625–26 (1991).  Once Brian left his car, he again did not submit to the

police, disobeying orders to drop the knife and get on the ground.[7]  *Id.*  It was not until

Brian charged at officers and was hit by a Taser bolt or a bullet that he was first "seized"

for purposes of the Fourth Amendment.  *Torres v. Madrid*, 141 S. Ct. 989, 1003 (2021).  As

explained above, however, that seizure was lawful.  *See Hassan*, 489 F.3d at 919.

Because Brian was not provoked to charge the officers by a violation of his Fourth

Amendment rights, the *Billington* rule would not help Ashley, even if the rule were still

good law.

Of course, the *Billington* rule is not good law.  The *Billington* rule has never been

the law of the Eighth Circuit (as *Billington* itself recognized, 292 F.3d at 1187), and the

rule was rejected by a unanimous United States Supreme Court in *Mendez*.  137 S. Ct. at

1546–48; *see also Frederick v. Motsinger*, 873 F.3d 641, 645–46 (8th Cir. 2017) (recognizing

---

[7]Ashley points to a "twenty-one-foot rule" that she says the officers violated.
ECF No. 41 at 30; *see also* ECF No. 41-1 at 18–19.  Whatever merit that rule may have as a
matter of policy, no case holds that it is compelled by the United States Constitution.

*Mendez*).  Of course, even under *Mendez*, "plaintiffs can—subject to qualified

immunity—generally recover damages that are proximately caused by any Fourth

Amendment violation."  *Id.* at 1548.  But, again, Ashley has failed to establish that any

Fourth Amendment violation preceded Brian's shooting, let alone that such a violation

proximately caused Brian's death.[8]

For these reasons, the officers are entitled to summary judgment on the § 1983

claims and the declaratory claim insofar as it seeks a declaration as to federal law.

---

[8]Ashley also cites the case of a Minneapolis police officer, Mohamed Noor, *see generally State v. Noor*, 964 N.W.2d 424 (Minn. 2021), for the proposition that "Minnesota has imposed a higher standard on law enforcement officers than is known in most other American jurisdictions"—a standard that "deems [officers'] transgressions criminal, not merely potentially civil."  *See* ECF No. 41 at 21–23.  Putting aside the fact that the same county attorney's office that prosecuted Noor *declined* to prosecute any of the officers involved in this case, the *Noor* case and this case have dramatically different facts.  Most significantly, Noor's victim, unlike Brian, did not commit a felony, did not defy numerous police commands, and did not charge at Noor or anyone else while brandishing a knife.  Moreover, whether an officer is subject to *criminal* liability under *state* law has little bearing on whether an officer is subject to *civil* liability under *federal* law.  The legal standards differ significantly.

C.  Monell *Claims*[9]

*Monell* "liability under 42 U.S.C. § 1983 occurs only when a constitutional injury

is caused by 'a government's policy or custom, whether made by its lawmakers or by

those whose edicts or acts may fairly be said to represent official policy.'"  *Grayson v.

Ross*, 454 F.3d 802, 810–11 (8th Cir. 2006) (quoting *Monell*, 436 U.S. at 694).  To succeed

on the *Monell* claims, then, Ashley must identify an unconstitutional policy or custom,

and she must prove that the unconstitutional policy or custom caused a deprivation of

Brian's constitutional rights.  *See Russell v. Hennepin Cnty.*, 420 F.3d 841, 848 (8th Cir.

2005); *Williams-El v. Johnson*, 872 F.2d 224, 230 (8th Cir. 1989).  But as explained above,

Brian's constitutional rights were not violated.  Thus, the cities are entitled to summary

judgment on the *Monell* claims and the declaratory claim insofar as it seeks a declaration

as to federal law.

D.  *State-Law Claims*

The remaining claims are state-law claims and the portion of the declaratory

claim dealing with Minnesota law.  The Court does not have original jurisdiction over

those claims, as the parties are not diverse.  The Court could exercise supplemental

jurisdiction over those claims under 28 U.S.C. § 1367(a), but, because the claims over

---

[9]The official-capacity claims against the officers are, in fact, *Monell* claims against
the cities.  *Elder–Keep v. Aksamit*, 460 F.3d 979, 986 (8th Cir. 2006) ("A suit against a
public official in his official capacity is actually a suit against the entity for which the
official is an agent.").

which the Court has original jurisdiction are being dismissed before trial, the Eighth

Circuit requires this Court to decline to exercise supplemental jurisdiction over the

remaining state-law claims. *Hervey v. Cnty. of Koochiching*, 527 F.3d 711, 726–27 (8th Cir.

2008). Thus, Ashley's state-law claims are dismissed without prejudice "so that [they]

may be considered, if at all, by the courts of Minnesota." *Id.* at 726.

ORDER

Based on the foregoing, and on all of the files, records, and proceedings herein,

IT IS HEREBY ORDERED that defendants' motions for summary judgment [ECF

Nos. 27, 33] are GRANTED. In particular:

1.   Plaintiff's federal claims are DISMISSED WITH PREJUDICE AND ON

     THE MERITS.

2.   Plaintiff's state-law claims are DISMISSED WITHOUT PREJUDICE.

LET JUDGMENT BE ENTERED ACCORDINGLY.


Dated:  July 26, 2022                          s/Patrick J. Schiltz
                                              Patrick J. Schiltz, Chief Judge
                                              United States District Court